# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LUCKY FELLA LLC d/b/a SKY BAR, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 08936 |
| | ) | |
| VILLAGE OF OAK BROOK, et al., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This action comprises nine seemingly disparate claims brought by a bar, its owner, a former police chief, and a former village president against the Village of Oak Brook, Illinois, several Oak Brook police officers, the current village manager and village president, and three current or former village trustees. There is no claim common to any two plaintiffs (except the bar and its owner, who are not differentiated in this litigation); the common thread is that all plaintiffs are aggrieved by some action by current or former employees of Oak Brook.[1] All of the plaintiffs save one bring constitutional and conspiracy claims under 42 U.S.C. § 1983 and § 1985 as well as Illinois tort claims; former Village President John Craig's sole claim is defamation.

Robert Sanford is one of the defendants. He is a former Oak Brook Trustee, who was not a trustee at time of the events complained of. In other words, he was a private citizen in 2011 when he allegedly violated the constitutional rights of plaintiff Sheahan and defamed him (Counts I, II, and VII), and allegedly violated the constitutional rights of plaintiff Burnat and Sky

---

[1] No defendant has raised any objection to the joinder of these claims.

Bar (Counts V, VI, and VII).² Sanford moves to dismiss all the claims against him under Federal Rule of Civil Procedure 12(b)(6).

## FACTS

This summary sets forth the factual allegations as they pertain to defendant Sanford, leaving out much of the plaintiffs' saga except as needed for context. These allegations are treated as true for purposes of this motion only. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

Plaintiff Iwona Burnat is the principal owner of co-plaintiff Lucky Fella, LLC, the Illinois Corporation that owns Sky Bar, a bar in Oak Brook. While open, Sky Bar was subjected to an inordinate and unfair number of "bar checks"—inspections by the Village for compliance with the terms of the bar's liquor license. Police officers, including certain defendants, routinely harassed the bar's owner and manager and drove away customers with their frequent presence. At one point Burnat was falsely accused of assaulting the wife of a politically connected tow-truck operator. Sky Bar's liquor license was revoked in September 2011 for "no rational reason." Burnat alleges that the liquor license was revoked because she was perceived to be aligned with former Village President John Craig and refused to support the political campaign of current Village President Gopal Lalmalani. She says the revocation therefore constitutes unlawful retaliation for her exercise of her First Amendment rights. She also alleges that the harassment of her business was based on her sex, in violation of the Equal Protection Clause.

Plaintiff Thomas Sheahan is the former police chief of Oak Brook who resigned, allegedly under duress (including death threats) in April 2011. According to the complaint,

---

² The plaintiffs purport to sue Sanford as an individual and in his "official capacity as a former Trustee of the Village of Oak Brook." The latter designation, however, makes no sense. Sanford is not being sued for any events that occurred while he was a trustee and has no "official capacity" as a former trustee.

2

Sheahan was taken down by foes in Oak Brook because he investigated an incident between some of the defendant police officers and plaintiff John Craig at Sky Bar on November 13, 2010, and thereafter investigated a "leak" to the media of "false" police reports and defamatory emails concerning the incident. Sheahan also brought misconduct charges against a popular police officer, Steven Peterson, that led to Peterson's termination in February 2011. Around this time, an anonymous handbill was circulated that contained "false and unsubstantiated statements" about Sheahan, including that he "habitually" called women, including his employees, an insulting epithet; that he referred to a village trustee by an anti-Semitic epithet; and that he took kickbacks. Village Manager David Niemeyer discussed the handbill's "false accusations" with the village board and village president without first discussing them with Sheahan. Based on the Sky Bar incident and the handbill, the trustees launched an investigation, "allegedly into the Oak Brook Police Department morale," as a pretext to investigate Sheahan. As a result of this "outcome driven" investigation and the "publication of false content contained in the aforementioned handbill," Sheahan found his professional environment "hostile and unbearable," and resigned on April 26, 2011.

The Village of Oak Brook offered Sheahan a severance package, and during the negotiations, defendant Robert Sanford, then a private citizen, provided Village Manager David Niemeyer with a copy of a document pertaining to a fine paid by Sheahan to the Illinois Department of Insurance in connection with "a minor complaint when [Sheahan] was licensed to sell insurance." Sheahan had previously disclosed "this information" to the village when he applied to become police chief. Sanford gave Niemeyer the document for the "sole purpose" of "interfere[ing] with Sheahan's ability to secure a negotiated severance package." Niemeyer provided the document to village trustee Gerald Wolin, "who consequently voted to reduce

Sheahan's severance package based upon that information." There are no other allegations against Sanford in the complaint. Sheahan's claims against Sanford (among other defendants) are for depriving him of a liberty interest in his good name, conspiring to do so, and defaming him.

## DISCUSSION

Robert Sanford moves to dismiss all claims against him, arguing that sparse factual allegations of his personal involvement in any of the conduct the plaintiffs complain of fail to add up to a plausible claim for relief. In a complaint, a plaintiff must set forth "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). He need not plead a detailed set of facts, so long as the complaint supplies the defendant with "fair notice of what...the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The claim must be "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009); *Twombly*, 550 U.S. at 570, meaning that "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). There must be "sufficient factual allegations to permit the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," *Engel v. Buchan,* --- F.3d ----, 2013 WL 819375 (7th Cir. Mar. 5, 2013),, and "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Iqbal,* 556 U.S. at 678 (internal quotations omitted). In reviewing a plaintiff's claim, the Court must construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor; however, legal conclusions and conclusory allegations are not entitled to this treatment. *Id.* at 664.

### A. Sheahan's constitutional claims

Based on the facts recounted above, plaintiff Sheahan alleges that defendant Sanford (among other defendants) unlawfully deprived him of a liberty interest in his "good name" without due process of law, and conspired with others to do so. Sanford argues that these claims must be dismissed as to him because (1) plaintiffs' allegations show that Sanford was not a public official acting under color of state law; (2) Sheahan fails to allege facts that plausibly suggest that Sanford deprived him of a protectable liberty interest; and (3) Sheahan fails to plausibly allege any agreement or other facts necessary to state a conspiracy claim.

Section 1983 creates a cause of action for constitutional violations committed by persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. All § 1983 plaintiffs must allege conduct occurring "under color of state law," and, when the plaintiff alleges a Fourteenth Amendment violation, "the challenged conduct must also constitute state action." *Tarpley v. Keistler*, 188 F.3d 788, 791 (7th Cir. 1999). However, "[t]hese two requirements—color of law and state action—are functionally equivalent." *Id.*

Under some circumstances, a private actor may act "under color of state law." There are myriad tests that attempt lay down general principles, but in the end, "the answer is situation-specific and fact-driven." *Id.* at 792. Here, Sheahan argues that Sanford, who was admittedly a private citizen at the time he provided a copy of Sheahan's citation to Niemeyer, can be liable as a state actor because he conspired with state actors. Sheahan is correct that the element of "state action" can be satisfied by private citizen's conspiracy with state actors. *See, e.g., Dennis v. Sparks*, 449 U.S. 24 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Sheahan also separately alleges a conspiracy claim against Sanford under 42 U.S.C. § 1985. *See Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) ("The function of § 1985(3) is to permit recovery

from a private actor who has conspired with state actors."). Since conspiracy is Sheahan's only basis for "state action" by Sanford, these two claims against him effectively overlap.[3]

"To establish Section 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (internal citations omitted); *Stagman v. Ryan*, 176 F.3d 986, 1003 (7th Cir. 1999) ("We have held that to establish joint action, a plaintiff must demonstrate that the public and private actors shared a common, unconstitutional goal.").

Here, Sheahan alleges no facts that plausibly suggest any kind of coordination or agreement between Sanford and any state actors—the hallmark of a conspiracy. *Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007) ("The minimum ingredient of a conspiracy…is an agreement to commit some future unlawful act in pursuit of a joint objective."). All the complaint says is that Sanford gave a document to Niemeyer in order to interfere with Sheahan's receipt of a severance package. There are no factual allegations that make it plausible that Sanford took this action pursuant to any agreement or understanding with Niemeyer or anyone else, let alone for an unlawful purpose. The plaintiffs assert that it can be inferred that Sanford did not act on his own in providing Niemeyer with the information about the insurance fine, but offer no explanation for why that is so and the complaint alleges no other facts at all about

---

[3] However, that is not to say that both claims were properly brought. Section 1985 is not a general conspiracy statute; it applies only to class-based—that is, equal protection—claims, which Sheahan does not bring. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir.2008); *Nowicki v. Ullsvik*, 69 F.3d 1320, 1325 (7th Cir.1995). The defendants have not pointed out this flaw in Sheahan's pleading, but it is of no moment, because whether the conspiracy is the means of satisfying the "state action" requirement of the § 1983 claim or the basis of a § 1985 claim, Sheahan fails to allege any facts to support the existence of an agreement to violate a protected liberty interest in his good name.

Sanford that would plausibly suggest that in providing this information he was acting in concert with Niemeyer or any of the other defendants. Indeed, the dearth of allegations in the complaint about Sanford suggests, if anything, that Sanford had little interaction with the other defendants, a fact that cuts against an inference of conspiracy.

Moreover, the conspiracy has to involve an unconstitutional action. Here, though, there are insufficient factual allegations to plausibly suggest that Sanford joined any agreement to deprive Sheahan of a liberty interest. Sanford's only action, according to the complaint, was to prompt one trustee to vote to reduce Sheahan's severance package (and the complaint does not even allege that the package was reduced, much less that the single Trustee's vote was material to the result). Sheahan does not, and cannot, argue that he had a liberty interest in a severance package from the Village. Rather, the complaint alleges that Sheahan was deprived of his "good name" based upon two principle events: (1) republication by defendant Niemeyer of a handbill containing "false statements" about Sheahan, including that he used inflammatory epithets and took kickbacks, and (2) defendant Cates making "false accusations" that Sheahan was involved in serious crimes against the owner of a tow truck company. As a result of these actions, Sheahan alleges that his reputation was damaged to the extent that his ability to be employed as a police officer in the future was foreclosed.

"[R]eputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). But if coupled with the "alteration of legal status," such as when the defendant state actor casts such doubt on an individual's reputation that it becomes "virtually impossible for [him] to find new employment in his chosen field," there can be a claim for infringement of the plaintiff's liberty interest to pursue

the occupation of his choice. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 618 (7th Cir. 2002).

So far as the complaint alleges, Sanford was involved in neither of the events that allegedly damaged Sheahan's reputation. Although he does allege that his future employment prospects were impaired, Sheahan cannot base a claim on the one act Sanford allegedly committed that damaged him: providing a document to Niemeyer that accurately reported that Sheahan had disclosed to the Village of Oak Brook the fine he paid to settle a complaint against him with the Department of Insurance. The plaintiffs fail to connect that act with any damage to his reputation, much less an inability to find other employment as a police officer. More fundamentally, Sheahan could not have been damaged by Sanford's dissemination of information to a Village official that Sheahan had already disclosed himself. Moreover, there is no constitutional violation in providing truthful information to government officials. Sheahan accedes to the truth of the information that Sanford passed on, although he questions Sanford's motive for doing it. On their face, however, Counts I and II are premised on the circulation of "false information" about Sheahan by persons other than Sanford. Those counts must therefore be dismissed as they relate to Sanford.

### B. Sheahan's tort claim

Sheahan also lumps Sanford in among the six defendants to Count VIII who allegedly committed the tort of defamation *per se*. "To state a claim for defamation, a plaintiff must present facts demonstrating that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of the subject statement to a third party, and that the publication caused damages to the plaintiff." *Stone v. Paddock Publications, Inc.*, 961 N.E.2d 380, 391 (Ill. App. Ct. 2011) (citing *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009)). In support of

the defamation claim, Sheahan again relies on the factual allegations that defendant Niemeyer republished the handbill containing the inflammatory "false statements" about Sheahan, and that defendant Cates made "false accusations" that Sheahan committed crimes against the owner of a tow truck company.

And that is where Sheahan's complaint falters: he has not alleged that "the defendant"—Sanford—made any false statement or made an unprivileged publication of the statement to a third party. Indeed, he specifically names other individual defendants who made or published defamatory remarks about him. Without any factual allegations of involvement by Sanford, there is no plausible defamation claim stated against him. Moreover, the only factual allegations pertaining to Sanford involve him providing *truthful* information to Niemeyer about the Insurance Department complaint against Sheahan. Sanford's conduct could not be defamatory because he made no false statements, by Sheahan's own admission. *See Hnilica v. Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931 (Ill. App. Ct. 2008) ("true statements cannot support a claim of defamation").

### C. Burnat's constitutional claims

Plaintiff Burnat's claims against Sanford are even less substantial than Sheahan's because she does not supply a single factual allegation of anything that Sanford said or did to involve himself in the events of which she complains, namely, the harassment of her business and unfair deprivation of a liquor license. Sanford accordingly moves for dismissal of Burnat's First Amendment retaliation, equal protection, and conspiracy claims (Counts V-VII) because she fails to allege any facts to suggest he was personally involved. It is well settled that "[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged

constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012) (quoting *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)).

Burnat responds as follows:

> Plaintiffs have demonstrated in the complaint that Sanford was involved in attempting to remove Sheahan from office along with Niemeyer, Wolin, and Saiyed and that was the result of a large conspiracy to stop Sheahan's attempt to investigate the harassment of Burnat and Lucky Fella LLC by the Village of Oak Brook. Sanford's willing participation with Niemeyer, Wolin, and Saiyed in their effort to force Sheahan's resignation and tamper with his severance package was part of a larger conspiracy to enable the Village of Oak Brook to continue to harass and Burnat and result in the closure of Skybar. Sanford's participation and furtherance in the conspiracy helped clear the way for the Village Oak Brook to carry out their policy of harassment.

Pl. Response, Dkt # 54 at 10-11. Burnat apparently intends to show that by providing Niemeyer with a truthful document containing information Sheahan had already disclosed, after Sheahan had resigned as police chief, Sanford tipped a line of dominoes leading to the closure of Sky Bar. But there are no factual allegations in the complaint that plausibly suggest the convoluted chain of causation that Burnat suggest. Without some factual allegations to flesh out the claim, it is not reasonable to infer that Sanford's provision of the document to Niemeyer had anything to do with Burnat or Sky Bar (much less that it could be deemed a proximate cause of the bar's demise). Sanford is not alleged to have participated in any way in the events of November 12 (when Burnat says she was false accused of assault) and November 13 (when a dispute arose between plaintiff Craig and police officers) at Sky Bar, or the ensuing investigations. The conclusory allegation that Sanford was part of a conspiracy-within-a-conspiracy are wholly inadequate to state a claim. Just like Sheahan, Burnat utterly fails to supply any facts that suggest an agreement by Sanford with any other defendant. The "assertion of a conspiracy is an unsupported legal conclusion that we are not bound to accept as true." *Redd v. Nolan* 663 F.3d

10

287, 292 (7th Cir. 2011) (affirming dismissal of claim where "the complaint includes not a whiff of a conspiratorial agreement or any improper complicity . . . to support the conclusory allegation"). This failure to plausibly allege any joint activity or agreement also dooms Burnat's effort to peg Sanford as a state actor based on an allegation that he conspired with government officials. Even more so than Sheahan's, Burnat's claims are bereft of any factual allegations that would provide a basis for inferring an agreement or understanding between him and any government official to bring about a violation of Burnat's constitutional rights.

### D. Applicability of anti-SLAPP legislation

Sanford also moves for dismissal and payment of his attorneys' fees pursuant to a provision of the Illinois Citizen's Participation Act ("ICPA") designed to discourage so-called strategic lawsuits against public participation, or "SLAPP" suits.[4] *See* 735 ILCS 110/1 *et seq*. As the moving party, it is Sanford's initial burden to show that the plaintiffs' complaint against him is "based on, relates to, or is in response to" acts by Sanford "in furtherance" of his "rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15. Such acts "are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." *Id.*

Sanford's initial argument, in its entirety, is that "[t]he conduct Sheahan ascribes to Sanford— publishing a public document to an elected official—falls within the protection of the Citizens' Participation Act, and to allow Sheahan's claim to proceed would improperly restrict the very type of public speech that the Illinois legislature sought to protect when passing the

---

[4] SLAPPs are "lawsuits aimed at preventing citizens from exercising their political rights or punishing those who have done so." *Wright Development Group, LLC v. Walsh*, 238 Ill.2d 620, 630 (2010). SLAPPs use the threat of money damages or the prospect of the cost of defending against the suits to silence citizen participation; anti-SLAPP statutes "guard against the chilling effect of SLAPPs." *Id*. at 630-31.

Act." In his reply brief, he elaborates that his actions were designed to procure a favorable government outcome (denial of Sheahan's severance package) and are therefore protected by the ICPA. He argues: "Since any severance package would have been paid out of public funds, Sanford, as a citizen, taxpayer and resident of Oak Brook, was certainly entitled to lobby Niemeyer and otherwise oppose Sheahan's attempts to obtain a severance package." The plaintiffs retort that Sanford's actions could not have been "genuinely aimed at procuring favorable government action" because the "document Sanford produced was ten years old and had been disclosed to Oak Brook upon Sheahan's hire."

Neither party addresses *Sandholm v. Kuecker*, 962 N.E. 2d 418 (Ill. 2012), the Illinois Supreme Court's most recent interpretation of the ICPA, although the case was decided before the instant motion was filed. In *Sandholm*, the Supreme Court held that the statute must be construed to apply only to sham SLAPP actions expressly designed to chill speech, and not to actions where the plaintiff is seeking monetary relief for an alleged tort. *See id.* at 430-433. After *Sandholm*, "even if Defendant was attempting to procure a favorable result with the [government], as long as Plaintiff's objective in bringing suit was not to stifle Defendant's political expression but sought redress for damages incurred by Defendant's alleged [torts] the ICPA does not protect Defendant's speech." *Cartwright v. Cooney*, 2012 WL 1021816, at *7 (N.D. Ill. 2012). In other words, "[i]f a plaintiff's complaint genuinely seeks redress for damages from defamation or other intentional torts and, thus, does not constitute a SLAPP, *it is irrelevant whether the defendants' actions were 'genuinely aimed at procuring favorable government action, result, or outcome.*'" *Sandholm*, 962 N.E. 2d at 433 (emphasis added).

The parties' arguments focus only on whether Sanford was genuinely attempting to procure a favorable government outcome. In the wake of *Sandholm*, that is not enough to show

whether the ICPA does or does not apply. Therefore, Sanford has not met his initial burden to show that the plaintiffs are attempting to chill political speech and are not genuinely seeking redress for damages. His request for attorneys' fees is therefore denied, although the claims against him are nevertheless dismissed for reasons unrelated to the ICPA.

* * *

Counts I, II, V, VI, VII and VIII of the Second Amended Complaint are dismissed as they relate to defendant Sanford. As this is the third iteration of the plaintiffs' complaint, the dismissal is with prejudice.

Entered: March 29, 2013

John J. Tharp, Jr.
United States District Judge