**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LUCKY FELLA LLC d/b/a SKY BAR, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 08936 |
| | ) | |
| VILLAGE OF OAK BROOK, et al., | ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

In this lawsuit against a number of current and former employees and elected officials of the Village Oak Brook, the plaintiffs allege a wide-ranging conspiracy that deprived them of their constitutional rights and violated Illinois tort law. The plaintiffs are (1) Iwona Burnat, individually and in her capacity as the principal owner of Lucky Fella LLC, which operated a tavern, Sky Bar, in Oak Brook until November 2011; (2) Sky Bar; (3) John Sheahan, the police chief of Oak Brook from April 2005 until April 2011; and (4) John Craig,[1] Oak Brook's Village President from April 2007 to May 2011. Burnat and Sky Bar's principal claim is that the village subjected Sky Bar and Burnat personally to harassment and ultimately revoked the bar's liquor license without a rational basis; their claims are predicated on theories of equal protection and First Amendment retaliation. Sheahan claims that he was forced to resign after a pattern of

---

[1] Craig is not listed as a plaintiff in the caption of the second amended complaint and, for that reason, the docket in this case reflects that he was terminated as a plaintiff. Nevertheless, that complaint includes a count in which Craig is the sole plaintiff, and his continued participation in the litigation belies an intent to withdraw from the case, so the Court will direct the clerk's office to reinstate him as a plaintiff (if only for the purposes of dismissing his claim, as set forth further below).

unlawful conduct that deprived him of his due process right of liberty; he also claims that he was defamed by certain village employees. Craig's sole claim is defamation. [2]

Pending before the Court are two motions for summary judgment, one by defendant Moin Saiyed, a former Oak Brook trustee, and one by Village Manager David Niemeyer and the Village of Oak Brook. Unless otherwise noted, these three defendants, who are jointly represented, are referred to collectively as the "defendants." The remaining multitude of defendants—apart from Robert Sanford, whose motion to dismiss the Court granted on March 29, 2013—have never been served with process or appeared in the case. The defendants moved for summary judgment early in the case, before discovery had taken place. The plaintiffs, however, did not respond to the motions by seeking leave to defer its response to allow the taking of necessary discovery pursuant to Rule 56(d)(2), but rather chose to respond to the motion on the merits, with their own sworn statements as evidentiary support. Accordingly, the Court addresses the motions as presented. Before summarizing the facts, however, the Court must detour through the defendants' requests that it strike a large portion of the plaintiffs' factual submissions in response to their motions.

I.      Motions to Strike

The defendants challenge the adequacy of the plaintiffs' factual submissions in opposition to the motions. The Northern District's Local Rule 56.1 augments the general requirement the party asserting that a fact cannot be or is genuinely disputed must support the assertion with specific citations to the record of admissible evidence. *See* Fed. R. Civ. P. 56(c). As relevant here, the local rules require that the party opposing summary judgment file "a

---

[2] As will be seen, the basis of joinder of all of these claims is anything but clear. The defendants, however, have eschewed any argument about the propriety of joinder in favor of summary judgment motions directed to all of the claims on the merits.

concise response to the movant's [factual] statement that shall contain (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." L.R. 56.1(b)(3). Federal Rule 56(c)(4) further provides that any supporting affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Here, in the first of two motions to strike, the defendants argue that large portions of the plaintiffs' Local Rule 56.1(b)(3) response statements fail to comply with the applicable rules and should be disregarded. The Court agrees, for several reasons. First, the plaintiffs did not submit a statement of additional facts under Local Rule 56.1(b)(3)(C), to which the defendants would have had an opportunity to reply. Instead, they assert new facts (sometimes supported, sometimes not) in the guise "responding" to the defendants' statements. This practice sows confusion and deprives the defendants of an opportunity to respond to the additional fact contentions, which is why the local rule requires the party opposing summary judgment to set forth any additional facts in a separate statement. Failure to comply with this straightforward requirement is not optional, and the Court is well within its discretion in striking fact contentions that do not comply. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[S]everal of Ammons' responses to Aramark's allegations admit to the allegation but then add other additional facts. These facts should have been included in a separate statement. They were not, and the district court did not abuse its discretion in striking the responses."). The

Court therefore strikes all additional facts submitted as purported responses to facts asserted by the defendants.

Second, the plaintiffs' responses to the defendants' fact contentions often fail to indicate the basis of the fact dispute or identify record evidence supporting the objection. Responses that suffer from these deficiencies warrant striking. *See id.* at 818 (court has discretion to disregard "[c]itations to an entire transcript of a deposition or to a lengthy exhibit" or response that "simply denied an allegation and provided no citation whatsoever"; there is no excuse for respondent commenting on allegation without "at least indicating that it agrees with or denies the allegation"). The Court therefore strikes any response disputing an asserted fact (or, in plaintiffs' preferred parlance, deeming it "false") without citing to admissible record evidence identified with some degree of specificity or that simply reproduces the defendants' assertion of fact or otherwise fails to indicate whether the defendant's factual assertion is admitted or disputed.

Based on these criteria, the Court strikes the following paragraphs of the plaintiffs' Local Rule 56.1(b)(3) response to defendant Saiyed's factual statement (Dkt. # 56): 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, and 38. For the same reasons, the Court strikes the following paragraphs of the plaintiffs' response to the other defendants' fact statement (Dkt. # 52) : 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30.   Any non-responsive or additional facts contained in these paragraphs will be disregarded, and the facts in the defendants' corresponding paragraphs are deemed admitted.  "[A] district court is entitled to expect strict compliance with Rule 56.1," and, furthermore, "substantial compliance is not strict compliance." *Ammons,* 368 F.3d at 817. The plaintiffs' adherence to the rules is far from "substantial," and the offending material will not be considered.

The defendants also move to strike large portions of the individual plaintiffs' affidavits as admissible evidence because the statements are hearsay, lack foundation, are not based upon personal knowledge, and/or contain opinions and conclusions. These objections, too, are largely well-taken.[3] "Affidavits offered in support of or opposition to summary judgment create an issue of fact only to the extent that they provide evidence that would be admissible if offered live on the witness stand." *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002). Some of the plaintiffs' statements clearly are not based on their personal knowledge and are lacking foundation; they are easily disregarded. Resolving hearsay objections on the cold record might be somewhat more difficult as the purpose for which certain statements might be offered is not clear from the papers, but the Court has not found it necessary to grapple with that issue because the plaintiffs' affidavits are now largely immaterial, having been submitted to support a Rule 56.1 response which has been stricken in large part for failure to comply with the rules.

## II. Motions for Summary Judgment

Defendants Saiyed, Neimeyer, and the Village move for judgment on all the constitutional and tort claims against them. In reviewing motions for summary judgment, the Court construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

[3] The Court notes as well that, in their briefs, the plaintiffs mischaracterize a number of statements in the affidavits. To cite just one example, in their response to the Oak Brook brief, the plaintiffs cite to the affidavit of John Craig in support of their statement that, in harassing the Skybar, Oakbrook police "were acting directly on behalf of Trustees Saiyed, Wolin, and Village Manager Niemeyer." Response, Dkt. # 51 at 1. The paragraph of Craig's affidavit cited in support of that statement, however, says nothing at all to support that assertion; it states only that Niemeyer took over the investigation of the Sky Bar situation at the urging of Saiyed and Wolin. *See* Craig Affidavit ¶ 30, Dkt. # 51-3.

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To show a genuine dispute, plaintiffs cannot simply rest on their pleadings but must make reference to specific supporting material; mere disagreement with the movant's asserted facts is inadequate. *See Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008). Summary judgment is proper when the movant shows that the plaintiff cannot establish the existence of an essential element on which he or she will bear the burden of proof at trial. *Kidwell,* 679 F.3d at 964.

## FACTS

The following facts are taken from the parties' Rule 56.1 statements and responses, but only to the extent they comply with the applicable rules and were not stricken on the defendants' motions. As a result, it is difficult to set forth a coherent picture of the disputes in this case.[4]

Defendant Moin Saiyed was a member of the Village of Oak Brook Board of Trustees from April 2007 until May 2011. Defendant David Niemeyer is the Village Manager and has held that position since September 2007.

Plaintiff John Craig was the President of the Village of Oak Brook Board of Trustees and the Local Liquor Commissioner from April 2, 2007 until May 1, 2011. He lost the April 5, 2011,

---

[4] For context, the Second Amended Complaint alleges a conspiracy against Burnat and Sky Bar consisting of a pattern of harassment by the Oak Brook police under the guise of performing "bar checks," that is, inspections relating to compliance with the liquor code. Burnat alleges that she was falsely accused of an assault at Sky Bar on November 12, 2010, and that, in the aftermath, police officers submitted false reports about it. She also alleges that on November 13, 2010, she invited Village President John Craig to come to Sky Bar and witness the alleged harassment. At that time, police officers allegedly had an altercation with Craig, which later prompted Chief Sheahan to launch his own internal investigation of the officers' conduct. Burnat further alleges that the liquor license was revoked because she or Sky Bar's manager refused to support Craig's opponent in (and the ultimate winner of) the April 2011 municipal election. These allegations and many others relating to the alleged conspiracy against Burnat and Sky Bar are set forth in the complaint, but at the summary judgment stage, no admissible evidence has been properly presented to the Court regarding any of it. Accordingly, the Court sets forth only the facts that have been properly supported with citations to admissible evidence and presented properly in accordance with Local Rule 56.1.

municipal election to Gopal Lalmalani, who has held the positions of President and Local Liquor Commissioner since taking office shortly after that election.

Plaintiff Iwona Burnat, a woman, was the principal owner of plaintiff Lucky Fella, LLC, the Illinois corporation that owned Sky Bar in the Village of Oak Brook. Sky Bar's liquor license was revoked on September 13, 2011, by order of Mr. Lalmalani in his capacity as Local Liquor Commissioner. Notice of the intent to revoke was issued on August 25, 2011, and a hearing was held on September 12. In the revocation order, the Commissioner found violations of seven provisions of the Liquor Control Ordinance by Sky Bar. The order revoked Sky Bar's provisional liquor license and denied the bar's application to renew its license. Defendant Niemeyer was present at the revocation hearing but did not, so far as the record shows, participate. Defendant Saiyed was no longer a trustee at the time of the revocation proceedings and did not participate. Sky Bar did not appeal the revocation.

Plaintiff Thomas Sheahan was the Chief of Police in the Village of Oak Brook until April 29, 2011.  At a closed executive session of a Village Board meeting on January 25, 2011, at which Plaintiff Craig was present, trustee Gerald Wolin (one of the unserved defendants) stated that he had received information from village residents about a morale problem in the police department. After some discussion, the Board of Trustees directed Niemeyer to investigate morale in the Oak Brook Police Department. Niemeyer informed Chief Sheahan that he would be contacting certain police officers to sit for confidential interviews with Niemeyer and the Village's human resources coordinator. Neimeyer told Sheahan that the officers would be informed that "there will be no retribution for any of their comments." Niemeyer ultimately interviewed nine members of the police department. He reported the results to the Board in a closed executive session meeting on February 22, 2011. Defendant Saiyed was out of the country

and did not attend the February 22 session. At that time the Board decided that an outside firm should conduct an investigation of the police department. On March 1, 2011, Niemeyer and the Assistant Village Manager met with Sheahan to inform him of certain allegations that had been made about him in the course of the interviews.

Also in February 2011, an anonymous handbill was circulating in the Village; it contained accusations of misconduct against Sheahan, including that he "habitually called women, including female employees, 'cunts'; that he (2) took kickbacks from a tow truck company; and (3) "called Oak Brook Trustee Gerald Wolin 'a little Jew.'" On March 8, 2011, in an open session of a regular Village Board meeting that was broadcast throughout the village on local cable television, resident Fred Capetta raised the matter of the anonymous handbill and the accusations against Chief Sheahan; he disclosed the contents of the handbill during his remarks. At the executive session following that meeting, Niemeyer informed Craig and the Board that he had met with Chief Sheahan on March 1. He also provided the Board with a proposal from an outside firm to perform an independent investigation of the police department.

At some time after March 8, Niemeyer received a copy of the anonymous handbill that had been mentioned at the public meeting and about which Niemeyer had also received telephone calls from concerned residents. Niemeyer caused a copy of the handbill to be circulated to all of the Trustees in an email.

On March 22, 2011, at a closed executive session of the Village Board, the Trustees directed Niemeyer to issue Requests for Proposals to four firms to conduct an investigation of the police department. The Board and Craig interviewed applicants on April 19, 2011. On April 29, 2011, before any such investigation began, Chief Sheahan submitted a letter of resignation to the outgoing Village President, Plaintiff Craig, and his resignation was accepted. Thereafter, the

Village Board, including Trustee Saiyed, voted to give Sheahan a severance package including a payment of the equivalent of four months' salary.

**DISCUSSION**

The defendants raise numerous arguments to defeat the plaintiffs' claims, including various immunity defenses, which the Court addresses in turn.

**A.    Counts I and II: Sheahan's Claims of Deprivation of Liberty Interest and Conspiracy.**

In Counts I and II, Sheahan alleges that multiple defendants including Saiyed, Niemeyer, and the Village, conspired to, and did, unconstitutionally deprive Sheahan of a liberty interest in his "good name" by (in summary) investigating him, disseminating and failing to correct false statements about him, and creating the circumstances that compelled him to resign. Sheahan describes this as a campaign of retribution for his personal investigation of what he believed was misconduct by some of his own police officers toward plaintiffs Burnat and Craig at Sky Bar on November 12 and 13, 2010. He alleges that he will never be able to work in his chosen profession because of the defendants' actions, and attests that "several" police departments have declined to interview him because of "turmoil" in Oak Brook.

**1.    Saiyed**

Defendant Saiyed contends that he was not personally involved in most of the events about which Sheahan complains and that he has legislative immunity and qualified immunity for the rest, specifically, for joining the other trustees in authorizing an investigation of the police department and voting on Sheahan's severance package on April 26, 2011.

State and local legislators are absolutely immune in any action for damages under § 1983 for their actions that are "legitimate legislative activity" and not done "for their private indulgence." *Tenney v. Brandhove*, 341 U.S. 367-77 (1951); *see Bogan v. Scott-Harris*, 523 U.S.

44, 49 (1998); *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) (explaining that there is "no material distinction between the need to insulate legislators at the national level to protect the public good, and the same need at the local level"). Absolute legislative immunity attaches to the introduction and voting on local ordinances. *Biblia Abierta v. Banks*, 129 F.3d 899, 904 (7th Cir. 1997). Moreover, "the claim of an unworthy purpose does not destroy the privilege." *Tenney*, 341 U.S. at 377; *see Biblia Abierta,* 129 F.3d at 903 ("absolute immunity shields a legislator's conduct even when that conduct is based on improper motives"); *Benedix v. Vill. of Hanover Park,* 677 F.3d 317, 318 (7th Cir. 2012) (legislative immunity applies "no matter the motives of those who proposed, voted for, or otherwise supported the proposal").

Here, Saiyed argues that any of his actions in ordering or allowing an investigation into the police department and voting on a severance package for Sheahan after his resignation are legislative functions for which he enjoys absolute immunity. Although some of the conduct is not as straightforward as the quintessential legislative act of voting on an ordinance, *Benedix,* 677 F.3d at 318, Saiyed is correct that their general character is inseparable from his legislative duties. The nature of the action is determinative. *Hansen v. Bennett,* 948 F.2d 397, 404 (7th Cir. 1991); *see Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011). Actions that are subject to immunity include (1) introducing, debating, and voting on legislation; (2) activities that could not give rise to liability without inquiry into the legislative acts and the motives behind them; and (3) activities essential to facilitating or preventing the core legislative process. *Biblia Abierta*, 129 F.3d at 903. Saiyed's vote to authorize the expenditure of Village funds on a severance package for Sheahan clearly fall within the scope of his absolute immunity—as do any of the actions he took in educating himself on the issue leading up to his vote. His actions—to the extent he was even involved—as they pertain to the police department investigation are also

covered by legislative immunity, although the applicability of the doctrine is somewhat less clear in this instance. The plaintiffs invite scrutiny of the closed-session meetings of the Village Board, at which they discussed personnel and other sensitive matters not required to be aired in public meetings. *See* 5 ILCS 120/1(c)(1). Any liability premised on the trustees' authorization of an investigation—a possible precursor to legislative action—would require scrutiny of their motives in a manner inconsistent with legislative immunity.

Even if Saiyed was not immune from these claims of Sheahan's, they would likely fail anyway. Because the mere act of authorizing an investigation does not deprive anyone of anything, it is unclear how that action is required to be preceded by due process. Furthermore, Sheahan has failed to suggest any reason why as a Trustee Saiyed had any duty to correct false statements by members of the public, and has failed in any event to establish that Saiyed knew they were false. Indeed, Sheahan suggests that the mere fact of investigating the truth of the statements would violate his rights. Counts I and II must fail as to Saiyed.

### 2. All defendants

As an alternative argument—one also advanced by Niemeyer and the Village—Saiyed contends that Sheahan cannot show that he suffered the type of injury required for liability on a loss-of-reputation claim under the Due Process Clause. Reputation—"good name," as Sheahan calls it—is not a protected liberty interest in itself. *Paul v. Davis*, 424 U.S. 693, 708-09 (1976). However, when a loss of reputation is accompanied by "the alteration of legal status, in the sense of a deprivation of a right previously held under state law," it justifies the use of procedural safeguards—that is, due process. *Schepers v. Comm'r, Ind. Dep't. of Corr.*, 691 F.3d 909, 914 (7th Cir. 2012) (*citing Paul*, 424 U.S. at 708-709). This is known as the "stigma plus" test. *Id.*

The defendants argue that Sheahan cannot establish anything but simple reputational harm stemming from the alleged defamation. In response, Sheahan argues that he is effectively blacklisted and cannot work as a police officer again; he says that in that he has not been able to obtain any other position despite his 27-year career in law enforcement. That allegation may be enough to state a claim under the stigma-plus theory, but at the summary judgment stage, Sheahan is obligated to submit evidence that could convince a reasonable jury. He has not done so. Even if the Court looks to his affidavit, in which he attests to having "attempted to interview at several police departments" and having been told he could not be hired because of the "turmoil in Oak Brook," he falls short. It does not permit the conclusion that he lost any employment *because of* defamation or other conduct by the defendants. Even when "serious impairment of one's future employment" results, defamation by a government official does not deprive a person of a liberty interest.[5] *See Santana v. Cook County Bd. of Review*, 679 F.3d 614, 621 (7th Cir. 2012); *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010). That threshold is reached only where it is "virtually impossible" to find new employment in the plaintiff's chosen field. *See Brown v. City of Mich. City, Ind.*, 462 F.3d 720, 730 (7th Cir. 2006). Sheahan's testimony does not allow the conclusion that virtually all future employment as a police officer is closed to him as a result of defamation. For example, there is no evidence that any of the unnamed police departments who did not interview Sheahan even had knowledge of the allegedly defamatory statements that were circulated about him in Oak Brook; this leaves him unable to establish that he "suffered tangible loss of other employment opportunities *as a result of* the public disclosure." *Harris v. City of Auburn*, 27 F.3d 1284, 1286 (7th Cir. 1994) (emphasis added).

---

[5] This assumes that there was any defamation. The Court does not suggest otherwise, but other than Sheahan's improperly presented denials, there is no evidence to establish either way the truth or falsity of the statements circulated about Sheahan.

Because Sheahan cannot show that any stigma he suffered took a concrete form beyond a mere reputational interest, or that it caused him to be unemployable, he cannot satisfy the stigma plus test. *See Brown*, 462 F.3d at 730. Furthermore, Sheahan never addresses the other question relevant to his due process claim: what "process" should he have been afforded with respect to the actions he complains of? *See Schepers*, 691 at 915 (after plaintiff established stigma-plus, court must still consider "whether Indiana is providing whatever process is 'due.'"). Sheahan complains that he was not given an opportunity to refute the handbill before Niemeyer circulated it to the Village Board. Leaving aside the undisputed fact that the handbill's contents had already been publicly broadcasted at a televised open meeting, Sheahan does not say why he should have been allowed to refute the document *before* the trustees (essentially, his employers) had seen it. The record also shows that Niemeyer met with Sheahan and gave him an opportunity to respond to the allegations before the Village engaged an independent firm to investigate. That investigation (although Sheahan resigned before it was conducted) was itself a form of process; no action was taken with respect to his employment in the meantime. It would seem that Sheahan's resignation cut short any process the Village was affording him. Anyway, the Court will not substitute its own speculation about the appropriate amount and form of due process when Sheahan does not suggest what kind of procedures the defendants failed to give him.

Sheahan's inability to establish either the deprivation of a protected liberty interest or the absence of proper procedural safeguards dooms not only the due-process claim but the conspiracy claim as well. A civil-rights conspiracy requires an unlawful act. *See Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007) ("The minimum ingredient of a conspiracy, however, is an agreement to commit some future unlawful act in pursuit of a joint objective.").

Another argument advanced by all the defendants as to the conspiracy alleged in Count II is the intracorporate (or intra-agency) conspiracy doctrine. A conspiracy by definition requires multiple actors; when all members of the conspiracy all work for the same entity, and their actions are in service of that entity, they are functionally the same actor and therefore cannot conspire with each other. *Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 642 (7th Cir. 2006) ("In a corporate conspiracy, co-conspirators must be outside of the corporation"); *Travis v. Gary Community Mental Health Ctr.*, 921 F.2d 108, (7th Cir. 1990). The doctrine extends to public entities as well as private corporations. *See Wright v. Ill. DCFS*, 40 F.3d 1492, 1508 (7th Cir. 1994).

Applying this principle, any meetings and discussions among Niemeyer and the Village Trustees (including Saiyed) about the investigation of Sheahan and the police department cannot be a conspiracy. "[D]iscussions of corporate business among corporate executives are not "'conspiracies.'" *Travis*, 921 F.2d at 110. The same is true for any discussions and legislative activity related to Sheahan's severance. A municipality, like a corporation, can act only through its agents; where those agents—here, the village's elected officials and their principal agent, the Village Manager—act jointly, and without the participation of outsiders, they are not participating in a "conspiracy."

## B.      Count III: Conspiracy to Prevent Sheahan from discharging his duties

Count III, against Niemeyer and the Village, is easily disposed of because, as the defendants point out, Sheahan was not a federal officer. There is a federal cause of action for conspiracy to interfere with the discharge of the official duties of *an officer of the United States*. 42 U.S.C. § 1985(1). That law "applies only to a conspiracy to [un]lawfully affect the official duties of a federal official." *Friedman v. Village of Skokie*, 763 F.2d 236, 238 (7th Cir. 1985);

*see Baron v. Carson*, 410 F. Supp. 299, 301 (N.D. Ill. 1976). Section 1985(1) is inapplicable to a local government employee, and Sheahan does not argue that his constitutional rights or another federal law were violated by the alleged interference, so as to make it actionable under § 1983. Simply put, federal law has nothing to say about local government officials interfering with the duties of a local police officer, and the plaintiffs cite no authority suggesting otherwise.

Despite adopting the language of § 1985(1) (interference with discharge of official duties), Sheahan suggests in his response brief that the "conspiracy" violated § 1985(3), which pertains to agreements to deprive an individual of equal protection. To be actionable under § 1985(3), though, the conspiracy must be motivated by racial or other class-based discriminatory animus. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008); *Bowman v. City of Franklin*, 980 F.2d 1104, 1109 (7th Cir. 1992). Nothing in the complaint, let alone in Sheahan's arguments, suggests any kind of class-based motivation for Niemeyer's alleged interference with Sheahan's internal investigation of his police officers. Sheahan does not claim to be part of any protected class. For all these reasons, the conspiracy claim in Count III fails as a matter of law.

**C.     Count IV: Burnat's and Sky Bar's due process claim.**

In Count IV, Burnat and Sky Bar allege that Niemeyer and the Village deprived her of property—the bar's liquor license—without due process of law. Defendants Niemeyer and the Village move for summary judgment, arguing that they have qualified immunity, that Burnat received due process and then failed to exhaust her state-law remedies, and that there was a rational basis for revoking the license.

Burnat's procedural due process claim is difficult to characterize. As the record shows, the loss of the liquor license occurred after the plaintiffs were given advance notice and a license revocation hearing, as required by Illinois law. Burnat's representative attended the September

12, 2011, hearing, following which a written order of revocation was issued with findings of fact. Thus, record shows that the revocation occurred pursuant to established state procedures. A liquor license cannot be revoked or suspended "except after a public hearing." 235 ILCS 5/7–5, at which the licensee "must be afforded the basic rights of procedural due process." *Boom Town Saloon, Inc. v. City of Chicago*, 892 N.E.2d 1112, 1117 (Ill. App. Ct. 2008); *Lopez v. Illinois Liquor Control Comm'n*, 458 N.E.2d 599 (Ill. App. Ct. 1983). To ensure these rights, the decision of the local liquor commissioner is appealable to the state commission, and thereafter is subject to judicial review pursuant to the state's Administrative Review Law. *See* 235 ILCS 5/7–5, 7-9, 7-11; *Connor v. City of Chicago*, 820 N.E.2d 1153, 1156 (Ill. App. Ct. 2004). The plaintiffs do not argue that they were not given the procedures to which they were entitled under state law or that the procedures are inherently inadequate.

The plaintiffs claim, however, that the hearing process was just a "sham," which the Court takes as an argument that the revocation was the result of a random and unauthorized act of a state official, and not the product of valid procedures. As the defendants point out, however, when a plaintiff's due process claim is premised on this theory, she must "must either avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate." *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996). Here, the plaintiffs did not afford themselves of the process available to them under state law. Nor do they argue or attempt to show that the extensive state appeals process is inadequate to protect their rights. Thus, their procedural due process claim fails.

In their response brief, the plaintiffs now hint at a *substantive* due process violation, although such a claim was not evident in their complaint. Any such claim is doomed by their failure to test the adequacy of state-law remedies. *See LaBella Winnetka, Inc. v. Village of*

*Winnetka*, 628 F.3d 937 (2010) ("Substantive due process challenges involving only the deprivation of a property interest are cognizable where the plaintiff shows 'either the inadequacy of state law remedies or an independent constitutional violation'") (citing *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003)). The plaintiffs do not attempt to show the inadequacy of their state-law remedies. As for an "independent constitutional violation," they do not specifically argue that one occurred, although the complaint also alleges an equal protection violation. That claim, as shown below in the discussion of Counts V and VI, fails as a matter of law. Therefore, Burnat fails to establish the violation of either procedural or substantive due process with respect to the revocation of Sky Bar's liquor license.

**D.      Counts V and VI: Burnat's Equal Protection and Conspiracy Claims**

In Counts V and VI, Burnat alleges that Saiyed, Niemeyer, and the Village, among other defendants, deprived her of her equal protection rights and conspired to so. She alleges that the "unlawful harassment" of Sky Bar by all defendants, as well as Niemeyer's "grant of immunity" to the police officer defendants (who, she says, had made trouble at Sky Bar) during his investigation of the police department, violated her equal protection rights as a female and someone who associated with "a foreign born Indian"—bar manager Reggie Benjamin.

The Equal Protection clause protects against government action that discriminates on the basis of membership in a protected class or that irrationally targets an individual for discriminatory treatment as a "class of one." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). Burnat never says what type of claim she intended here. The defendants apparently assume she is proceeding under a class-of-one theory, because their chief argument is that she fails to identify any similarly situated person who was treated better than she was, as would be required for a class-of-one claim. *See id.*

The complaint, though, predicates the claim on Burnat's membership in a protected class. *See* Compl., Dkt. #13 ¶¶ 115-117. And she alleges that her gender and her "association with Reggie Benjamin" were a "motivating factor" in the unlawful harassment she received in the form of frequent bar checks by police. That sounds not like a class-of-one claim, but instead like a straightforward equal protection claim, as to which the "similarly situated" requirement would be irrelevant. *See McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (explaining that only in context of public employment cases does the analytical framework from Title VII apply to equal-protection claims that are not "class of one" claims). Yet type of action Burnat complains of—harassment and unfair treatment of her bar—is not the kind of generally applicable legislation or policy that normally forms the basis of an equal protection claim; that is, one predicated on an action that affects a class of people of which the plaintiff is a member. And the complaint also refers to Burnat's treatment in relation to "other similarly situated liquor licensees," Compl., Dkt. # 13 ¶ 120, as well as the defendants' alleged "malice and bad faith," *Id.* ¶ 121. These references invoke class-of-one theory more than traditional equal protection principles.

Burnatt's response brief, too, hints that hers is class-of-one claim, because of her assertions that "[o]ther liquor establishments were involved in far greater mishaps and were not checked as much as Skybar. Likewise another establishment was issued similar noise complaints but was not checked nearly as many times as Skybar." Combined with the allegations that the village lacked any rational basis for singling out Skybar, this makes for a viable claim of discrimination for pleading purposes. However, at the summary judgment stage, it falls far short of satisfying the plaintiff's burden to supply evidence that she was "arbitrarily or irrationally targeted for unfavorable treatment." *See Del Marcelle v. Brown Cty. Corp*., 680 F.3d 887, 889,

913 (7th Cir. 2012) (*en banc*); *Reget*, 595 F.3d at 695. Burnat fails to establish that other bars were not subject to  frequent checks (she attests to this, but provides no foundation for her personal knowledge), or that the Village did not have reason to scrutinize Sky Bar. When the basic facts about Sky Bar's "harassment" are not in the record, it is impossible to conclude that the conduct was irrational or arbitrary.

As for the conspiracy count, the claim fails for any number of reasons already explained with respect to Count II: the intracorporate conspiracy doctrine, the failure to establish any agreement among conspirators, and the absence of proof of unlawfulness, to start a list that is not necessarily exhaustive.

**E.      Count VII: Burnat's and Sky Bar's Claim of First Amendment Retaliation**

In Count VII, which targets defendants Saiyed, Niemeyer, and the Village (among others), Burnat alleges that the revocation of Sky Bar's liquor license was punishment for her refusal to endorse Gopal Lalmalani in the April 2011 race for Village President against plaintiff John Craig. First Amendment retaliation occurs when (1) the plaintiff engaged in activity protected by the First Amendment; (2) the plaintiff suffered an adverse action that would likely deter future First Amendment activity, and (3) the First Amendment activity was at least a motivating factor in the decision to retaliate. *Santana*, 679 F.3d at 622.

**1.      Saiyed**

Defendant Saiyed first argues that he had no involvement in the liquor license revocation proceedings.  As far as the record of evidence shows, he is correct. Village trustees like Saiyed had no authority to grant or revoke liquor licenses. Saiyed in particular had been off the Board of Trustees for months before the notice of hearing was served on Burnat on August 25, 2011, and he had no role at all in the September 12 hearing or the September 13 decision of the Local

Liquor Commissioner—Mr. Lalmalani, who came into office as Saiyed's term as a Trustee ended. The other retaliatory act that Burnat alleges—granting "immunity" to police officers who harassed Sky Bar—is even more attenuated from Saiyed. Saiyed did not conduct any investigation into police officers and, as far as his uncontroverted testimony shows, he did not grant and did not know about any "immunity" given to any police officers.

Plaintiff argues, however, that Saiyed can be liable under § 1983 because he "[set] in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000) (further explaining that "an official satisfies the personal responsibility required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent") (internal quotation marks and citations omitted). Burnat's problem is that she has no evidence of any conduct by Saiyed that "set in motion" the revocation of Sky Bar's liquor license by Lalmalani months after Saiyed left the Village Board, or any other allegedly retaliatory act.

Burnat insists otherwise, however. She argues: "After the SkyBar proprietors rejected Saiyed's political overtures, a campaign of harassment by the police began. Police conducted more than 50 'license checks' in less than a year. When they filed a false police report to portray Burnat as a combatant in a bar fight. [*sic*] The plaintiffs have alleged sufficient facts to show that Saiyed began a campaign against SkyBar and when Craig and Sheahan became involved they were retaliated against by the board. Saiyed's direction to conduct license checks and other harassment led to the loss of the license and investors and the business itself." Response, Dkt. # 58 at 8. Again, these allegations could state a claim of First Amendment retaliation, but they do

not suffice at the summary judgment stage. The plaintiffs can only create an issue of material fact by supplying admissible evidence, but there is none regarding "Saiyed's direction" to conduct bar checks. Although they suggest that the Court should not enter judgment "on the pleadings," they never moved for time to conduct discovery in order to properly refute the affidavits and other evidence submitted by the defendants. *See* Fed. R. Civ. P. 56(d). And their failure to comply with Local Rule 56.1 cost them the opportunity to properly dispute the defendant's facts. Left with only their allegations to stand on, Burnat's retaliation claim against Saiyed must fail.

### 2. Neimeyer and the Village

For his part, Neimeyer submits that he cannot have "retaliated" against Burnat by granting immunity to police officers who harassed Sky Bar, ultimately resulting in the loss of Sky Bar's liquor license and business, because he never gave anyone immunity. That is not exactly what the evidence shows; Neimeyer made it clear during his investigation into police department morale that the officers would suffer no "retribution" or "retaliation" for any of their comments in response to his questions topics including department morale, communication and management, and "a matter regarding a towing company." It is not unfair for the plaintiffs to call this a kind of "immunity" from discipline. But the import of that characterization is a mystery in the context of a retaliation claim, which requires the Burnat to prove that she was subjected to "an adverse action that would likely deter future First Amendment activity." *Santana*, 679 F.3d at 622. "[T]he alleged adverse action—independently tortious or not—must be sufficient to deter an ordinary person from engaging in that First Amendment activity in the future." *Id*. The plaintiffs fail to explain how the manner in which Neimeyer conducted the police department investigation—which was not an investigation of Sky Bar or Burnat— could be sufficient to

deter an ordinary person from exercising her right to support or not support, or donate or not donate to, particular politicians. Further, they fail to draw the required causal connection between the act of granting "immunity" and Burnat's participation in protected activity. The plaintiffs assume a connection, but it is opaque without evidentiary support beyond plaintiffs' speculation.

The loss of the liquor license, by contrast, could certainly qualify as an "adverse action" by the appropriate defendant against Burnat. But, Niemeyer argues, that loss was the result of a revocation hearing and a revocation order that the plaintiffs never attempted to appeal. Therefore, he argues, the cause of Plaintiffs' deprivation was not the result of any alleged retaliation. As far as this argument goes, Niemeyer is correct: the record shows that Lalmalani revoked the license as a result of numerous violations of the liquor code, and this belies retaliation as a motive. *See Bodenstab v. County of Cook*, 569 F.3d 651 (7th Cir. 2009). As previously noted in the context of the due-process claim, the plaintiffs could have, but did not, challenged the legitimacy of the rationale for revoking the license, so they have no evidentiary basis for doing so in responding to the summary judgment motion (although they make their *beliefs* clear).

In any case, with respect to Niemeyer (as opposed to, for example, the local liquor commissioner) the plaintiffs yet again run up against the requirement of personal involvement. The do not establish that Niemeyer had any role other than attending the hearing. Moreover, the plaintiffs make no causal connection between Burnat's political activity and any action by Niemeyer. Niemeyer's problems with Sky Bar, to the extent any can be found in the record, had to do with noise complaints and the use of sexually provocative advertising for events held there. There is nothing to suggest he cared at all who Burnat supported, or did not support for Village

President; there is no evidence that he even *knew* who she supported. Thus he cannot be found liable for retaliating against her on account of protected political activity.

**F.    Count VIII : Sheahan's claim of defamation per se**

In Count VIII, Sheahan accuses Niemeyer and Jason Cates, a police lieutenant and an unserved defendant in this case, of defaming him. With respect to Niemeyer, Sheahan alleges that he "chose . . . to republish and communicate to third parties certain verifiably false statements contained within a circulating handbill."

Niemeyer argues that he is absolutely immune from this tort claim. Under Illinois law, an official of the executive branch of state or local government cannot be held liable for statements made within the scope of his official duties. *Blair v. Walker*, 349 N.E.2d 385, 389 (Ill. 1976). This immunity applies to village managers. *Springer v Harwig*, 418 N.E.2d 870, 872 (Ill. App. Ct. 1981) (village manager, as chief administrator, has absolute privilege to discuss matters legitimately related to his official responsibilities). Indeed, the privilege, like legislative immunity, applies irrespective of any improper motives, knowledge of falsehood, or even malice. *See Geick v. Kay*, 603 N.E.2d. 121, 127 (Ill. App. Ct. 1992).

Sheahan does not respond to the claim of absolute immunity, although he attempts to refute Niemeyer's alternate defense of statutory immunity under the Illinois Tort Immunity Act. But the Court need not reach that defense.  Here, the record shows that Niemeyer "republished" the Sheahan handbill to the Village Trustees in a confidential email. This occurred after the handbill had been discussed by a resident of the Village in an open meeting of the Board that was also broadcast in the local community—effectively forcing the Board to consider the issue. Niemeyer subsequently discussed the allegedly defamatory information with other executive

officers in the context of his position as village manager, and he is therefore absolutely immune from any liability for defamation.

\* \* \*

It is clear that the plaintiffs perceive a vast police and government conspiracy that brought them all down in some way.  But instead of fleshing out an evidentiary record, they appear to have assumed that the connections they allege among seemingly unrelated incidents and personalities would be perceived as easily by outsiders. Between the lack of competent evidence and plaintiffs' often impenetrable briefing, the Court is unable to decipher what support might exist for the claims the plaintiffs allege. But as is often stated, summary judgment is, "roughly speaking," the "put up or shut up" stage of a lawsuit. *Schacht v. Wisconsin Dep't of Corrs.,* 175 F.3d 497, 504  (7th Cir. 1999). The moment need not have come so soon, but the plaintiffs acquiesced in the process by responding to the defendant's summary judgment motions on the merits rather than seeking discovery or other relief. And their responses fall short of showing a genuine issue of material fact for trial. Therefore, the defendants' motions for summary judgment are granted.

The only remaining claim that has not been addressed by a motion to dismiss or motion for summary judgment is Count IX, John Craig's state-law defamation claim against defendants Shuey and Cates. Those defendants have never been served with process and have not appeared in this case. Moreover, with all the federal claims now disposed of before trial, there is a presumption that the Court should relinquish supplemental jurisdiction over any remaining state-law claims. *RWJ Management Co. v. BP Prods. North America, Inc.*, 672 F.3d 476, 479-80 (7th Cir. 2012). Perceiving no reason not to follow the normal course—especially where the defendants have not even been served and the claim is based on still other distinct events—the

Court exercises its discretion to relinquish supplemental jurisdiction over Craig's defamation claim. That brings the entire case to a close.

Entered: June 11, 2013

_____
John J. Tharp, Jr.
United States District Judge